**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | No. 18-cr-00849 |
| v. | ) | |
| | ) | Judge Andrea R. Wood |
| DAWAUGHN GARRETT and | ) | |
| DANGELO GARRETT | ) | |

**MEMORANDUM OPINION AND ORDER**

A grand jury indicted Defendants Dawaughn Garrett ("Dawaughn") and Dangelo Garrett

("Dangelo," and together with Dawaughn, the "Garretts") with one count each of being a felon in

possession of a firearm in violation of 18 U.S.C. § 922(g)(1). Both Defendants have moved to

suppress evidence of the firearm that Chicago Police Department ("CPD") officers recovered from

Dawaughn, as well as subsequent statements that the Garretts made to officers and the fruits of

those statements, on the basis that the officers frisked the Garretts in violation of their rights under

the Fourth Amendment to the United States Constitution. (Dkt. No. 69.) For the reasons given

below, the Court denies the Garretts' motion.

**BACKGROUND**

Because the Garretts have challenged a warrantless search of their persons, the

Government bears the burden of establishing that the CPD officers had a reasonable articulable

suspicion that a crime was being committed.[1] *See United States v. Longmire*, 761 F.2d 411, 417–

18 (7th Cir. 1985). The Court draws the facts from the evidentiary hearing held on December 10,

2019. At the hearing, the Government presented testimony from two CPD officers, Sean Driskill

and Jose Ayala. The Government also presented a video (with no audio) taken by a police

---

[1] The Government has not argued that the officers had probable cause to search the Garretts or that they
placed the Garretts under arrest and searched them incident to that arrest.

observation device ("POD") surveilling the street, audio of police communications retrieved from a third-party website, and video captured by CPD officers' body cameras. The Government also attached a CPD case incident report to their response in opposition to the motion to suppress. The Garretts presented—as a demonstrative exhibit only—the audio of police communications synced with the video captured by the POD. The Garretts declined to call any witnesses at the hearing.

Driskill testified first, and his testimony made up the bulk of the evidentiary hearing. Driskill testified that he serves in the CPD's 15th District, which covers part of the west side of Chicago. He works in the district's Strategic Decision Support Center ("SDSC"). The SDSC is the intelligence center for the district. Officers at the SDSC control about 132 PODs, which are placed on light poles throughout the district. Driskill testified that his job at the SDSC consists of monitoring those PODs and reporting possible criminal activity to patrol officers by radio. As part of his monitoring duties, Driskill frequently observes people with unconcealed firearms on video.

According to Driskill, the incidents that led to the frisks, and later the arrests, of the Garretts took place in the early morning hours of November 3, 2018. Driskill testified that he was observing live video from the POD at the intersection of West Washington Street and North Laramie Avenue after hearing about several calls to police about nearby noise disturbances. Through the camera, he saw several people standing on the sidewalk outside of a building. One of them was drinking something out of a red Solo cup, which Driskill suspected was alcohol. Because of the Solo cup and the nearby noise disturbances, Driskill zoomed in on the group of people. Driskill did not recognize any of the people in the group, but the police later identified two of them as Dawaughn and Dangelo.

Driskill testified that, when he zoomed in on the group of people, he saw that a man wearing an olive-green jacket—whom police later identified as Dawaughn Garrett—had an object

2

in his right hand that Driskill identified as a handgun. Through the POD, Driskill observed Dawaughn pass the object to a man in a black jacket, whom police later identified as Dangelo. Driskill then saw Dangelo put the object in his waistband. Shortly afterward, he observed Dangelo remove an object from his waistband and pass it back to Dawaughn. Driskill believed that he saw Dawaughn place the object into his waistband.

Driskill testified that he immediately recognized the object that the Garretts were passing back and forth as a handgun based on his training, his experience with the SDSC, and his personal experience handling handguns. Driskill further testified that, in his opinion, the Garretts were acting nervously and making movements toward their waistbands. At one point, Driskill observed Dangelo bending over near the brick wall behind the Garretts, and Driskill suspected that Dangelo might have placed something into a slit or gap in the wall. Driskill testified that, because of that observation, he was not completely certain whether the gun was on Dawaughn's person, on Dangelo's person, or in or near the brick wall when officers first arrived on the scene.

After observing the Garretts passing the object back and forth, Driskill broadcast his observations on the police radio. Over the radio, he described the Garretts, stated that he thought they had been passing a handgun back and forth, and identified the street location where he had seen them on camera. Shortly afterward, Ayala and Lane—who were apprised of the information that Driskill had broadcast over the radio—ran onto the area of sidewalk where the Garretts were gathered with a few other people.[2] At first, the officers ran past the group of people; but the officers ran back to the Garretts and their group when the officers heard Driskill say over the radio

---

[2] In order to establish reasonable suspicion or probable cause, officers may rely on information conveyed by other officers. This is known as the collective knowledge doctrine. *See, e.g.*, *United States v. Williams*, 627 F.3d 247, 253–54 (7th Cir. 2010). There is no dispute that Driskill informed Ayala and Lane, the first officers who arrived at the scene, that he had seen the two men later identified as the Garretts passing a handgun back and forth on a public sidewalk near a particular intersection.

that they had gone too far. Driskill testified that he spoke to Ayala and Lane over the radio and directed them to stop and frisk the two men later identified as the Garretts because he had seen them displaying a firearm in public. Driskill also told Ayala and Lane to stop some of the other people standing with the Garretts. Driskill suggested patting down the Garretts in the waistband area because he thought he had seen each man put the gun in his waistband at some point.

Driskill watched the stop and frisk unfold through the POD camera. He testified that he observed Ayala and Lane place the Garrets and a third man against the wall and frisk their clothes. The officers did not find a gun. Driskill further testified that, as the officers frisked the men at the scene, he rewatched the POD footage of the Garretts displaying the gun. Based on rewatching the video, Driskill concluded that the gun might have ended up either in Dawaughn's waistband or in a slit in the brick wall behind the Garretts. Driskill informed Ayala and Lane of his conclusions over the radio.

Driskill observed that the officers made the Garretts continue to stand against the wall while they searched for a gun in or near the wall behind them. They did not find a gun in or near the wall. Over the radio, Driskill directed the officers to frisk Dawaughn's waistband. When the officers did so, they noticed an object that felt like a gun, and retrieved it from Dawaughn's pants. After they retrieved the gun, the officers arrested the Garretts, but they let the third man they had detained leave. Driskill testified that Ayala and Lane detained the Garretts for about five to six minutes before they retrieved the gun from Dawaughn's pants.

While the focus of the evidentiary hearing was Driskill's testimony, Ayala testified at the hearing as well. Ayala's testimony was consistent with Driskill's testimony. Ayala testified that he heard Driskill state over the radio that he had observed people publicly displaying a firearm near 50 North Laramie Avenue on the POD camera. Ayala and his partner Lane ran to that address in

response to Driskill's radio broadcast. Ayala testified that Driskill had described two men wearing

clothing that matched what the Garretts were wearing. When they arrived on the scene, Ayala and

Lane detained the Garretts and other people with them. Ayala did not recognize any of the people

he and Lane detained, and his only information about them came from Driskill's statements over

the radio. Ayala testified that he patted down the Garretts after detaining them. He did not find a

gun during that frisk. After the initial frisk failed to turn up a gun, Ayala received more

information from Driskill over the radio. Ayala testified that Driskill said that the firearm was

located in the crotch of Dawaughn's pants. With that information in hand, Ayala and Lane frisked

Dawaughn a second time and found a handgun in his pants.

The Court has thoroughly reviewed the POD footage, the officers' body-camera footage,

and the audio of police communications. The audio and video that the Government has proffered

are consistent with the testimony Driskill and Ayala offered at the evidentiary hearing. Most

importantly, the Court concludes that the object that Dawaughn and Dangelo pass back and forth

in the POD video appears to be a handgun and would have appeared to be a handgun to a

reasonable person watching the POD video live.

**DISCUSSION**

The Garretts contend that the Court should suppress the firearm that officers recovered

from Dawaughn and any fruits of the officers' search. In the Garretts' view, the officers lacked

reasonable suspicion to stop and frisk them. The Court concludes that the Garretts motion should

be denied for two reasons. First, the officers did not violate either man's constitutional rights

because the officers had reasonable suspicion to stop and to frisk both of the Garretts. And second,

even if the officers violated Dawaughn's constitutional rights while recovering the firearm (which

the Court finds they did not), Dangelo cannot move to suppress the evidence because only

Dawaughn has standing to do so.

## I. Legality of the Stop and Frisk

The Court must suppress evidence gathered in violation of the Fourth Amendment's

protection against unreasonable searches and seizures. *See Mapp v. Ohio*, 367 U.S. 643, 648–49

(1961). The Fourth Amendment protects the "right of the people to be secure in their persons,

houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV.

Subject to a few "well-delineated exceptions," searches conducted without a warrant are *per se*

unreasonable and the fruits of such searches should be suppressed. *Arizona v. Gant*, 556 U.S. 332,

338 (2009) (quoting *Katz v. United States*, 389 U.S. 347, 357 (1967)). One exception to the

warrant requirement is known as a *Terry* stop. *See Terry v. Ohio*, 392 U.S. 1, 21–22 (1968).

During a *Terry* stop, officers may briefly detain a person if they have a reasonable

suspicion that the person is engaged in or about to engage in criminal activity. *See United States v.*

*Adair*, 925 F.3d 931, 935 (7th Cir. 2019). While the officers must have more than an inarticulate

hunch, reasonable suspicion is a lower standard than probable cause. *See id.* Determining whether

the officers had reasonable suspicion is an objective inquiry based on the totality of the

circumstances. *See id.* Under this standard, the stop is permissible if the officer had a

"particularized and objective basis for suspecting the particular person stopped of criminal

activity." *Id.* (quoting *United States v. Cortez*, 449 U.S. 411, 417–18 (1981)).

If an officer who has stopped a person can point to specific and articulable facts suggesting

that the person is armed and dangerous, the officer may conduct a frisk of that person by patting

down "the suspect's outer clothing to search for weapons." *United States v. Howell*, 958 F.3d 589,

597–98 (7th Cir. 2020). Because a frisk is more intrusive than a stop, an officer frisking a person

6

must have reasonable articulable suspicion both that the person is involved in criminal activity and that the person is armed and dangerous. *Id.* at 598; *see also United States v. Lopez*, 907 F.3d 472, 485 (7th Cir. 2018) ("Even when a *Terry* stop is justified, whether a frisk is also justified is a separate question."). If the Government cannot demonstrate that the stop and the frisk complied with the Fourth Amendment, the Court must suppress the firearm and any fruits derived from it. *See Wong Sun v. United States*, 371 U.S. 471, 485–86 (1963).

On the record before it, the Court concludes that the CPD officers had reasonable articulable suspicion to stop and to frisk both Dawaughn and Dangelo. When Driskill watched Dawaughn and Dangelo pass an object back and forth over the POD camera, he identified the object as a weapon and quickly relayed that information to field officers. As noted, the Court agrees with Driskill's characterization of the object that he saw on camera. The object does appear to be a handgun, and the Court concludes that it was reasonable for a person watching the video in real-time to conclude that the Garretts were passing a handgun back and forth. Therefore, Ayala and Lane had reason to believe that both Garretts had publicly displayed a handgun. The information Ayala and Lane received from Driskill therefore gave the officers reasonable suspicion that Dawaughn and Dangelo both had committed criminal offenses under Illinois's gun laws.

Under Illinois law, a person who would like to carry a concealed handgun may apply for a concealed carry license. *See* 430 ILCS 66/10. But passing an unconcealed handgun on a public street is a crime in Illinois whether or not the people passing the gun have concealed carry licenses. A concealed carry license only permits a person to possess a handgun "completely or mostly concealed from view of the public or on or about a person within a vehicle." 430 ILCS 66/5; *see also* 430 ILCS 66/10(c). Displaying a handgun in a public place violates Illinois law—

even if the person displaying the handgun has a concealed carry license—and that violation constitutes a Class B misdemeanor for the first offense and a Class A misdemeanor for a subsequent offense. *See* 430 ILCS 66/70(e). And if the Garretts did not possess concealed carry licenses, then they committed a felony under Illinois law by possessing a handgun in a public space without a concealed carry license. *See* 720 ILCS 5/24-1.6(a)(1), (3)(A-5), (d).

It was reasonable for the officers to believe that both Garretts possessed and displayed a handgun in public. That gave the officers reasonable suspicion that both Garretts had violated Illinois criminal laws. Because of that reasonable suspicion, the officers had the authority to conduct a *Terry* stop for both Garrets. The same reasonable suspicion justified the officers' frisk of the Garretts. Driskill's observation that the Garretts passed a handgun back and forth gave the officers reason to believe that both the Garretts were "armed and dangerous." *Howell*, 958 F.3d at 597–98. A frisk of both men was justified because, while it is clear from the video that Dawaughn passed Dangelo a handgun, it is not completely clear from the video whether Dangelo passed the gun back or kept it in his possession. Therefore, either man could have had possession of the gun when officers arrived on the scene. In that situation, the Fourth Amendment allowed the officers to stop and frisk both Garretts.

While the Garretts' primary argument is that the officers lacked reasonable suspicion, they also argue that the officers located the gun only after the Garretts endured an unreasonably long detention. The Garretts correctly observe that a "police stop exceeding the time needed to handle the matter for which the stop was made violates the Constitution's shield against unreasonable seizures." *Rodriguez v. United States*, 575 U.S. 348, 350 (2015). A lawful *Terry* stop is a "brief detention," and any stop that is "too prolonged becomes a de facto arrest that must be based on probable cause." *United States v. Leo*, 792 F.3d 742, 751 (7th Cir. 2015) (citations and internal

quotation marks omitted). To assess whether an investigative stop lasted too long, the Court

considers "whether the police diligently pursued a means of investigation that was likely to

confirm or dispel their suspicions quickly." *United States v. Sharpe*, 470 U.S. 675, 686 (1985)

(affirming the legality of a 20-minute *Terry* stop). Applying that standard, the Court concludes

that the officers' detention of the Garrets was not unreasonably prolonged.

The entire encounter—from the officers' arrival to the recovery of the gun from

Dawaughn—took place over about six minutes. That is not an unduly long period of time,

particularly when officers had reasonable suspicion that both Garretts had violated Illinois gun

laws and that at least one of them likely had a firearm on his person. The Seventh Circuit has

regularly affirmed the legality of longer *Terry* stops, provided that the officers diligently pursued

their investigation. *See, e.g.*, *United States v. Adamson*, 441 F.3d 513, 521 (7th Cir. 2006) (stop of

around 25 minutes); *United States v. Martin*, 422 F.3d 597, 602 (7th Cir. 2005) (stop of around 20

minutes). The officers did frisk the Garretts twice: once before searching the area around them and

once after searching the area around them. But there is no bright-line rule that would prevent

officers from frisking someone twice, especially when the officers have reason to believe that a

person has a firearm on or near them. A brief frisk of the Garretts followed by a sweep of the area

and then a second frisk was a quick and diligent investigation, and the six-minute length of the

Garretts' detention was not an abnormal or unreasonable period of time for a *Terry* stop.

Furthermore, the officers on the scene were acting on information from the SDSC—not from their

personal observations—which likely slowed down how quickly they could recover the firearm.

Based on the foregoing factors, the Court concludes that the officers did not violate the

Fourth Amendment by holding the Garretts for too long or by frisking the Garretts twice. Because

the officers did not violate either man's rights while recovering the firearm, the Court denies the

Garretts' motion to suppress.

## II.      Dangelo Garrett's Standing to Challenge the Frisk

In addition to arguing that the frisk was lawful, the Government contends that only

Dawaughn—not Dangelo—has standing under the Fourth Amendment to move to suppress the

firearm. Because the officers did not violate either man's constitutional rights, it is not necessary

to resolve this issue of standing to decide the motion. Nonetheless, the Court concludes that the

Government is correct.

In the Fourth Amendment context, the concept of "standing" refers not to a jurisdictional

prerequisite but to the question of whether a defendant had a legitimate expectation of privacy in

the area searched. *See United States v. Mendoza*, 438 F.3d 792, 795 (7th Cir. 2006) (citing

*Rawlings v. Kentucky*, 448 U.S. 98, 104 (1980)). Fourth Amendment rights are personal rights,

and a defendant cannot move to suppress evidence if that evidence was recovered in violation of

someone else's rights but not his own rights. *See id.* (citing *United States v. Salvucci*, 448 U.S. 83,

85 (1980)). A defendant has a reasonable expectation of privacy in an area if "(1) the defendant

exhibits an actual or subjective expectation of privacy and (2) the expectation is one that society is

prepared to recognize as reasonable." *Id.* (citing *Katz*, 389 U.S. at 361). With a motion to

suppress, a defendant "cannot assert a privacy interest on behalf of someone else," and a

defendant must show an expectation of privacy in both the area searched and the object seized.

*United States v. Mendoza*, 438 F.3d 792, 795 (7th Cir. 2006).

Here, Dawaughn had a reasonable expectation of privacy in his person but Dangelo did not

have a reasonable expectation of privacy in Dawaughn's person. *See, e.g.*, *Rawlings*, 448 U.S. at

105 (holding that a man could not move to suppress drugs he had hidden in another person's bag).

The Garretts do not dispute that point or argue that Dangelo actually had a reasonable expectation of privacy in Dawaughn's person. Instead, they pose two arguments. The first is that the frisks of Dawaughn and Dangelo should be considered one indivisible search, not two separate searches, for purposes of Fourth Amendment standing. The second is that it would be unfair for the gun to be admissible against Dangelo but not against Dawaughn if the frisk violated Dawaughn's Fourth Amendment rights. Both arguments are unavailing.

First, the frisks of the two Garretts are best characterized as two separate searches. A search of a vehicle or a building could be considered one search even if involves a search of several areas of that vehicle or building. *See, e.g.*, *Rakas v. Illinois*, 439 U.S. 128, 134 (1978) (car search). But people are individuals in a way that two rooms in a building or two compartments in a car are not, and each person possesses his or her own constitutional rights. In the Court's view, the search of each of the two Garretts should thus be considered as a separate search affecting discrete constitutional rights. But even if the Court considered the frisks of the two Garretts to be one indivisible search, that would not be enough to create Fourth Amendment standing for Dangelo. Even if only one search took place, the Court must separately analyze whether the search invaded each defendant's reasonable expectations of privacy. *See Rakas*, 439 U.S. at 134 (holding that passengers in a car cannot move to suppress evidence found in the search of that car even if the owner or driver of the car could move to suppress); *United States v. Pitts*, 322 F.3d 449, 456–57 (separately examining the privacy interests of the sender and recipient of a package seized and searched while it was in the mail); *United States v. Covarrubias*, 847 F.3d 556, 558 (7th Cir. 2017) (holding that the intended recipient of a car being hauled on a car carrier lacked standing to suppress drugs found during a search of the car). A single search may impact multiple defendants. But that does not change the fact that a defendant can only move to suppress evidence

11

recovered from a search if that search invaded his or her own reasonable expectations of privacy. *See Rawlings*, 448 U.S. at 105 (holding that police did not invade a defendant's reasonable expectations of privacy when they searched another person's bag in which the defendant had hidden drugs).

The Garretts' second argument is, in essence, an argument that it would be unfair to allow the Government to introduce evidence against one defendant but not the other. But that disparity is the result of the personal nature of Fourth Amendment rights. It is common for a defendant to lack standing to challenge a search of another's person or possessions, even if that search turns up evidence against the defendant. *See United States v. Watson*, 558 F.3d 702, 705 (7th Cir . 2009) (holding that, even if a driver was coerced into giving consent to search her car, a passenger in the car lacked standing to move to suppress guns found in the car); *Christensen v. County of Boone*, 483 F.3d 454, 461 (7th Cir. 2007) (holding that the police did not violate one person's reasonable expectations of privacy by searching another person's cellphone); *United States v. Hodge*, 594 F.2d 1163, 1165 (7th Cir. 1979) (holding that a guest in an apartment lacked standing to challenge a search of the apartment, which resulted in the seizure of drugs that were introduced against the guest at trial). If police action infringes the constitutional rights of one defendant but not another, it follows from the personal nature of Fourth Amendment rights that the defendant whose rights were not violated cannot move to suppress the evidence. *See Rakas*, 439 U.S. at 133–34 ("Fourth Amendment rights are personal rights which . . . may not be vicariously asserted." (citation and internal quotation marks omitted)). Therefore, even if the officers violated Dawaughn's Fourth Amendment rights, Dangelo could not move to suppress the firearm because the officers' frisk of Dawaughn did not invade Dangelo's reasonable expectations of privacy.

## CONCLUSION

For the reasons give above, Defendants' motion to suppress (Dkt. No. 69) is denied.

ENTERED:

Dated:  August 27, 2020

Andrea R. Wood
United States District Judge

13